

# NUMBER 13-12-00454-CR and NUMBER 13-12-00455-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

CHRISTOPHER ALLEN GILLETTE,                                    Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

## On appeal from the 362nd District Court
## of Denton County, Texas.

# OPINION ON REHEARING[1]

### Before Justices Garza, Benavides, and Perkes
### Opinion on Rehearing by Justice Perkes

On May 29, 2014, we issued an opinion and judgments for these cause numbers.

The State timely filed a motion for rehearing.   After reviewing the motion and appellant's

---

[1] This case is before this Court on transfer from the Second Court of Appeals in Fort Worth pursuant to an order issued by the Supreme Court of Texas.   See TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

response thereto, we grant the State's motion for rehearing, withdraw our opinion and judgments dated May 29, 2014, and issue this opinion and revised judgments.

A jury convicted appellant Christopher Allen Gillette of two third-degree felony offenses of terroristic threat. *See* TEX. PENAL CODE ANN. § 22.07(a)(5), (6) (West, Westlaw through 2013 3d C.S.). One conviction resulted from statements appellant made in a letter to a congressman,[2] and the other conviction came from statements appellant made in a college class.[3] The jury assessed punishment for the count involving the letter at four years' confinement in the Texas Department of Criminal Justice, Institutional Division. For the count resulting from appellant's classroom statements, the jury assessed punishment at ten years' confinement, but the trial court suspended that sentence, placed appellant on community supervision for ten years, and ordered the two sentences to run concurrently. By eight issues, which we reorganize as three and re-order, appellant argues: (1) the evidence is insufficient to support the two convictions; (2) jury charge error either violated his right to a unanimous verdict or, alternatively, misinformed the jury of the requisite culpable mental state; and (3) the trial court should not have admitted extraneous-offense evidence. We affirm the trial court's judgment in appellate cause number 13-12-00455-CR, which convicted appellant for the statements he wrote in a letter to a congressman, but we reverse and remand the trial court's judgment in appellate cause number 13-12-00454-CR because we hold appellant suffered egregious harm by the jury charge's allowance for a non-unanimous verdict.

---

[2] Appellate cause number 13-12-00455-CR.

[3] Appellate cause number 13-12-00454-CR.

2

## I. BACKGROUND

### A. Appellant's Letter to United States Congressman Michael Burgess

Appellant sent a letter to United States Congressman Michael Burgess of the 26th Congressional District of Texas. In it, appellant vented many grievances against the United States government, including its alleged failure to provide him, a United States Army veteran, with proper medical care for injuries he received during his military service. At the conclusion of the letter, appellant listed demands and resultant penalties should his demands not be met. The relevant excerpt from the letter is as follows:[4]

> I <u>demand</u> the following:
>
> 1. An official apology, personally written or typed from a representative of the United States government in the U.S. House or Senate, acknowledging that the United States government has negligently failed to render proper medical care to my person. This official apology does not have to be laborious in length. Simple sincerity will suffice.
>
> 2. The utilization of the full economic and political might of the United States government congruent to its responsibility to provide proper medical care to it's [sic] veterans, specifically; the funding of a private option at my discretion until I am properly healed; subject to oversight of the office of my Congressional representative or another authority delegated by said office.
>
> 3. Compensation in some form or fashion for the severe pain I have encountered over the past decade of my life, subject to the wisdom and discretion of Congressman Burgess, or an authority delegated at his discretion.
>
> **If these demands are not met in a timely, efficient, and responsible manner then the following penalties will be applied.**
>
> 1. I will inform the American people of the criminal negligence of the United States government. The great masses of the people universally support me in this aspiration. I will shout so loud, and gather such a

---

[4] We have reformatted the tab stops in part of the excerpt for continuity. All emphases are as they appear in the original.

3

great assembly of voices to my person, that the outcry will figuratively shatter the eardrums of the entire United States Congress.

2. If I am able to find healing in the private sector, without just compensation or service from my government, I will begin preparations to begin offensive combat preparations against the federal government. These preparations will include great care not to target civilian non-combatant personnel, specifically women and children, and will not include the use of explosives or political assassination as a means of political change.

3. I will assume the United States government has refused to render proper medical aid to my person, an act tantamount to treason, and I will gather armed men of good character to my cause in order to place the entire United States Congress under arrest.

I am trying to warn you in the strongest terms humanly possible that on the median average I consider the central government largely illegitimate. I swore an oath to protect the U.S. Constitution, therefore protecting the American people, and I feel that the actions of the federal government are leading both myself and them down a path of involuntary servitude. These outrages will not be tolerated!

The police department at Texas Women's University ("TWU"), where appellant was a student, was made aware of the letter.

## B.     Appellant's Classroom Comments

About one week after appellant sent the letter to Congressman Burgess, appellant interrupted his upper-division American history class—a small,[5] discussion-oriented class—by raising his hand and voicing a complaint against the United States federal government. Appellant began,[6] "I am so angry that I cannot humanly explain it in words." The professor, Paul Travis, asked whether appellant's comment related to class, and

---

[5] The professor testified that the class had about 20 or 21 students.

[6] The following quotations are the Court's transcription of an audio recording of appellant's classroom statement, which was admitted into evidence and is included in the appellate record. Certain punctuation may be subject to interpretation.

appellant responded, "I would say I'm an American, uh, veteran, and I deserve medical benefits, and yes. I need to—I am in a lot of pain. Okay. I don't know where I need to go or who I need to talk to, but I'm about to tear Washington, D.C. apart brick-by-brick." Appellant continued,

I have the specified, specialized military training; I know how to do it. I am angry. I would never do anything to hurt any of the girls at this college, I want y'all to understand that. But I am mad. I am fighting-hopping-out-of-the-back-of-a-truck-with-an-AK-47 mad. I have a medical injury, and I cannot get help from my government. I'm in a lot of pain. I'm a 3.5 GPA; I'm a dean's list student. I'm failing school. Now I need you to talk to the president, the vice president or somebody. I don't know if I need to drive to a hospital or what, but I'm in a lot of pain.

Professor Travis asked appellant whether appellant felt like being in class, and appellant answered, "No. I need medical attention." Appellant gathered his belongings and said, "I need to go. There is a congressional inquiry[7] into the matter right now. I just need to go. I need to grab my stuff and go." Before leaving, appellant again asked Professor Travis to contact the vice president. It is unclear whether appellant was alluding to the president and vice president of the United States or of TWU, and there was no testimony clarifying the references.

Contrary to the alarming content of the statement, appellant's tone was calm, although anger can be detected. Appellant remained seated during the diatribe, standing only at the conclusion when he gathered his belongings to leave. Classmate Shannon Cloutier and Professor Travis testified they were concerned for appellant but unafraid. Classmate Colleen Hester, on the other hand, testified she was afraid, the

---

[7] The evidence showed that in his dealings with Congressman Burgess, appellant filled out a form entitled, "Congressional Inquiry."

teaching assistant was afraid, and appellant's body language manifested anger. Classmate Amanda Saye said appellant's monologue sounded about how one would expect a school shooting would begin and that she felt threatened. Saye and another classmate, Troy French, both testified that appellant's words made the students uneasy.

Class continued after appellant left. Hester testified that the teaching assistant was trying to calm the students, some of whom Hester described as "a wreck." French, a disabled veteran who served in the Army and suffered from Posttraumatic Stress Disorder ("PTSD"), was concerned for appellant. French knew appellant had past military service, and appellant's words struck French as PTSD "warning signs." French testified that appellant's words "ate at me. I felt like this was somebody who was needing help and was either going to hurt themselves or hurt someone else." French left class and called the campus police. Officer Jennifer Niederhaus of the TWU Department of Public Safety (TWUDPS) met French outside the classroom and asked Professor Travis to exit the classroom to discuss the incident.

When Officer Niederhaus learned appellant had made the statement, she recognized his name and contacted Sergeant Randy Leavell. Sergeant Leavell and Lieutenant Kenneth Adams testified that the TWUDPS had been "briefed" on appellant prior to that day. Lieutenant Adams explained that the briefing resulted from a letter appellant wrote to the chief of police in response to a parking ticket, "and also a letter that he had written to Congressman Burgess."

6

TWUDPS placed the campus on lockdown. Upon learning that appellant was at a VA hospital in Dallas, the TWUDPS secured a warrant to arrest appellant for committing a terroristic threat. Officers Leavell and Adams arrested him at the VA hospital.

## II. SUFFICIENCY OF THE EVIDENCE

By his fifth and sixth issues, as enumerated in his brief, appellant argues the evidence is insufficient to support either of his two convictions. Regarding his letter to Congressman Burgess, appellant contends his statements were not threats, were conditional, and were "vague and uncertain." Appellant also emphasizes that there was no evidence he owned ammunition or a gun. Regarding his classroom comments, appellant contends he did not threaten an offense involving violence to persons or property, and appellant asserts the evidence is insufficient to show he possessed the requisite intent to be guilty of a terroristic threat.

### A. Standard of Review

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). "The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (en banc)

7

(citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996)). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

## B. Appellant's Letter to Congressman Burgess

### 1. Applicable Law

To convict appellant of terroristic threat for the statements he made in his letter to Congressman Burgess, the jury needed to find beyond reasonable doubt that appellant threatened to commit an offense involving violence to a person or property with the intent to influence the conduct or activities of a branch or agency of the federal government. *See* TEX. PENAL CODE ANN. § 22.07(a)(6). The jury charge narrowed "offense involving violence to a person or property" to murder, aggravated assault, or criminal mischief. Those terms were not defined.

A person acts with intent with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct. TEX. PENAL CODE ANN. § 6.03

8

(West, Westlaw through 2013 3d C.S.).[8]   A jury can infer intent from the accused's acts, words, and conduct.   *See Phillips v. State*, 401 S.W.3d 282, 291 (Tex. App.—San Antonio 2013, pet. ref'd) (citing *Cook v. State*, 940 S.W.2d 344, 347 (Tex. App.—Amarillo 1997, pet. ref'd)); *Williams v. State*, 194 S.W.3d 568, 575 (Tex. App.—Houston [14th Dist.] 2006), *aff'd*, 252 S.W.3d 353 (Tex. Crim. App. 2008).

A terroristic threat is complete when a person makes a threat with the intent to influence the governmental body.   *See* TEX. PENAL CODE ANN. § 22.07(a)(6); *Dues v. State*, 634 S.W.2d 304, 306 (Tex. Crim. App. [Panel Op.] 1982); *Phillips*, 401 S.W.3d at 291.   It is not necessary that the threat actually influence the governmental body.   *See* TEX. PENAL CODE ANN. § 22.07(a)(6); *Phillips*, 401 S.W.3d at 291.   "[C]apability to carry out the threat is not an essential element of the offense . . . ."   *Jarrell v. State*, 537 S.W.2d 255, 257 (Tex. Crim. App. 1976); *see Phillips*, 401 S.W.3d at 291 (explaining that the statutory language only requires making a threat).

### 2.  Discussion

In his letter to Congressman Burgess, appellant directed "demand[s]" to the United States federal government.   Appellant demanded the government give him an official apology, "the funding of a private option" for his medical care, and compensation for past pain.   Appellant leveraged these demands with the threat to "begin preparations to begin offensive combat preparations against the federal government" and the "gather[ing of] armed men of good character to my cause in order to place the entire United States Congress under arrest."   Contrary to appellant's assertion that these words were too

---

[8] We agree with appellant that terroristic threat is a conduct-oriented offense.   *See infra* section III.

9

vague or uncertain to constitute a threat, a rational jury could find the words communicated a threat of murder, aggravated assault, or criminal mischief. That appellant conditioned the threats on the government's failure to satisfy his demands does not undermine their potency; in fact, it supports the jury's conclusion that appellant made the threats with the intent to influence the conduct or activities of Congress. *See Phillips*, 401 S.W.3d at 291–92 (disregarding defendant's contention that a conditional threat was insufficient under section 22.07(a)(6)).[9]

At the conclusion of the letter, appellant said he would attend the Congressman's upcoming town hall meeting. As a result, the local police department increased its security detail, but Congressman Burgess decided against canceling the meeting. Appellant attended the meeting, re-urged his complaint, and filled out a congressional inquiry form. There was no incident. On appeal, appellant argues these events show that no one was afraid and that he did not intend to threaten violence.

We are unpersuaded. The increase in the security detail is some evidence of fear. Regardless, although sometimes the victim's reaction to a threat can shed light on the actor's intent, *see In re A.C.*, 48 S.W.3d 899, 904 (Tex. App.—Fort Worth 2001, pet. denied); *Hadnot v. State*, 884 S.W.2d 922, 925–26 (Tex. App.—Beaumont 1994, no pet.) (citing *Jarrell*, 537 S.W.2d at 256–57),[10] evoking fear or succeeding in influencing the

---

[9] Some cases hold a conditional threat may be insufficient to cause fear of imminent serious bodily injury under Texas Penal Code section 22.07(a)(2). *See, e.g., Bryant v. State*, 905 S.W.2d 457, 460 (Tex. App.—Waco 1995, pet. ref'd). Those cases focus on the imminence requirement of subsection (a)(2). Imminence is not required in subsection (a)(6). *See* TEX. PENAL CODE ANN. § 22.07(a)(6) (West, Westlaw through 2013 3d C.S.); *Phillips v. State*, 401 S.W.3d 282, 291–92 (Tex. App.—San Antonio 2013, pet. ref'd).

[10] Again, these cases involve threats made under subsection (a)(2), and evidence of a victim's reaction may be more relevant to the element of imminence at issue in those cases.

governmental body are not elements of a terroristic threat. *See* TEX. PENAL CODE ANN. § 22.07(a)(6); *Phillips*, 401 S.W.3d at 291. Congressman Burgess's reaction after reading appellant's letter outside appellant's presence, considering the letter with his staff, and adopting a response to it provides no guidance to appellant's intent in sending it. A terroristic threat is complete when the accused, by threatening, seeks the desired reaction described in statute. *See* TEX. PENAL CODE ANN. § 22.07(a)(6); *Dues*, 634 S.W.2d at 306; *Phillips*, 401 S.W.3d at 292; *In re A.C.*, 48 S.W.3d at 904.

Likewise, although appellant stresses that there was no evidence he owned ammunition or a gun, the capability to carry out a threat is not an element of terroristic threat. See TEX. PENAL CODE ANN. § 22.07(a)(6); *Jarrell*, 537 S.W.2d at 257; *Phillips*, 401 S.W.3d at 291; *see also Williams*, 194 S.W.3d at 574–75. Moreover, at the time Congressman Burgess received this letter, he did not know that appellant did not own ammunition or a gun.

After viewing the evidence in the light most favorable to the prosecution, we conclude a rational jury could have found beyond a reasonable doubt that appellant, by sending the letter, committed the charged offense of terroristic threat. *See Johnson*, 364 S.W.3d at 293–94; *Brooks*, 323 S.W.3d at 898–99. We overrule appellant's sixth issue.

## C. Appellant's Classroom Comments

### 1. Applicable Law

The offense of terroristic threat has two components: (1) the act of threatening an offense involving violence to persons or property; and (2) intent. *See* TEX. PENAL CODE ANN. § 22.07(a). The statute lists six forms of intent. *See id.* With respect to

11

appellant's classroom comments, the jury could convict appellant if it found beyond a reasonable doubt that appellant threatened to commit murder, aggravated assault, or criminal mischief with the intent to place the public or a substantial group of the public in fear of serious bodily injury.   *See* TEX. PENAL CODE ANN. § 22.07(a)(5).   Alternatively, the jury could convict appellant for the same conduct upon finding beyond a reasonable doubt that he intended to influence the conduct or activities of a branch or agency of the federal government, the state, or a political subdivision of the state, *see id.* § 22.07(a)(6), to wit: the United States Congress or the TWUDPS.[11]

As noted in the previous subsection, a jury can infer intent from the accused's acts, words, or conduct.   *Phillips*, 401 S.W.3d at 291; *Williams*, 194 S.W.3d at 575.   Neither capability to carry out the threat nor success in causing the intended effect are elements of the offense.   *See* TEX. PENAL CODE ANN. § 22.07(a)(5)–(6); *Jarrell*, 537 S.W.2d at 257; *Phillips*, 401 S.W.3d at 291; *see also Williams*, 194 S.W.3d at 574–75.   The term "threatens" is not defined in the terroristic-threat statute.   *See* TEX. PENAL CODE ANN. § 22.07(a)–(g).   Black's Law Dictionary defines "threat" as "[a] communicated intent to inflict harm or loss on another or another's property."   BLACK'S LAW DICTIONARY 1618 (9th ed. 2009); *see Cook*, 940 S.W.2d at 347 (relying on sixth edition of Black's Law Dictionary to define "threat" for the purposes of section 22.07(a)(2)).   Nothing in the statute or in Black's definition of "threat" limits a threat to verbal communication.   *See* TEX. PENAL

---

[11] As part of his first two issues in his brief, addressed separately below, appellant argues the two intents constitute separate offenses under section 22.07.   *See* TEX. PENAL CODE ANN. § 22.07(a)(5), (6). We agree with appellant, but for the purposes of the sufficiency review, we, in using a hypothetically correct jury charge, *see Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009), assume the two offenses were charged separately, and we analyze the sufficiency of the evidence to determine whether a rational jury could have found either offense beyond a reasonable doubt.

12

CODE ANN. § 22.07(a); BLACK'S LAW DICTIONARY 1618. Where relevant, we address nonverbal communication, such as body language and tone.

Subsection (a)(6) does not require that the threatened audience—the one subject to a threat of violence—be the same as the audience which the person intends to influence. *See id.* § 22.07(a)(6).[12] Neither does it require that the threat reach the threatened audience or even that the actor expect it to reach that audience. *See id.* "The section is broad enough to cover threats to commit any crime of violence if the actor's intent is to cause fear, emergency action, or substantial inconvenience." *George v. State*, 841 S.W.2d 544, 546–47 (Tex. App.—Houston [1st Dist.] 1992), *aff'd*, 890 S.W.2d 73 (Tex. Crim. App. 1994) (en banc) (quoting SEARCY & PATTERSON, PRACTICE COMMENTARY, TEX. PENAL CODE ANN. § 22.07 (Vernon 1989) and citing 2 BRANCH, TEXAS ANNOTATED PENAL STATUTES, § 22.07 (3d ed. 1974)). A victim's reaction, while unnecessary to prove under the statute, may provide evidence of the actor's intent. *See In re A.C.*, 48 S.W.3d at 904; *Hadnot*, 884 S.W.2d at 925–26.

## 2. Discussion

We must uphold the jury's verdict unless, after viewing the evidence in the light most favorable to the verdict, we conclude that no rational jury could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19; *Johnson*, 364 S.W.3d at 293–94; *see also Runningwolf v. State*, 360 S.W.3d 490, 494 (Tex. Crim. App. 2012) ("The reviewing court is not to assess the evidence as the 'thirteenth juror.'" (quoting *Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App.

---

[12] In a classic hostage situation, for example, a person threatens one or more persons with the intent to influence a third party to action.

13

1988)); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (holding an appellate court's sufficiency review does not permit it to simply substitute its judgment for that of the fact-finder).

First, a rational jury could find that appellant's words conveyed a threat to commit murder, aggravated assault, or criminal mischief. The trial court admitted, over defense counsel's objection, part of an email that appellant sent to a friend about six months before the classroom incident.[13] The email stated, in relevant part:

> I'm sure you can classify me as dangerous. Because I am. Because when I get my back fixed and I get maneuver [sic] capability back, I'm going to do several things, like acquiring body armor, a fully automatic AK-47, an M4 assault rifle, and about 3,000 rounds each of 7.62 millimeter and 5.56 millimeter ammo. After that, I'm going to take about six months off and I'm going to get in the best cardiovascular shape of my life. I'm going to lift weights frequently. And then I'm going to start running and gunning and people are going to start dropping like flies. Paramilitary urban guerilla warfare. I'm going to be completely drug free the entire time. But if I get surrounded, I'll take enough PCP or ketamine to the point where I couldn't feel it if napalm was dropped on me. And as I lay on the floor with my lifeblood spilling through my teeth, I'm going to spit blood right in the fucking cop's face and I'm going to laugh. Because if we are willing to fight back to the point of death, then we've already won. I've had about all the shit I'm gonna take from this world, and I'm sick and tired of this place.

In light of this language, a rational jury could have interpreted appellant's classroom statement, which also referenced an AK-47, as more than mere invective; it could find appellant used that diction to threaten others to elicit some desired response.

The trial court also admitted evidence of an incident between appellant and

---

[13] By his eighth issue, appellant challenges the trial court's admission of this evidence. For the sufficiency review, we consider all evidence, whether admissible or inadmissible. *See Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Johnson v. State*, 967 S.W.2d 410, 412 (Tex. Crim. App. 1998); *Jaynes v. State*, 216 S.W.3d 839, 845 (Tex. App.—Corpus Christi 2006, no pet.).

another college professor that occurred at a different college about six months before this incident.[14] In that incident, appellant entered the wrong class (he was taking a class with the professor but at a different time), and when the students began laughing because appellant was looking around awkwardly, the professor, turning to the classroom from the chalk board, told appellant to sit down and shut up. Appellant complied, but immediately after class, he invited the professor to the hallway and, in an elevated voice, told the professor that he would not be treated that way. Appellant later emailed the professor, stating:

> If a teacher uses their authority in a heavy-handed manner, I want them to understand that they are dealing with an individual that has been specifically professionally trained to take human life. I wouldn't even let a police officer speak to me in that manner unless a loaded gun was pointed at me.

In light of this language, a rational jury could have found appellant's similar classroom phrasing, "I have the specified, specialized military training," to be a threat involving violence.

In addition to appellant's verbal communication, French testified that appellant looked around the classroom as he spoke, and Hester testified that appellant's body language communicated anger. Trial testimony showed some people felt threatened. This evidence, in combination with the other evidence, supports a finding that appellant made a veiled threat to the persons in the classroom. In context, appellant expressed anger with the federal government, but that does not mean he did not threaten to take his anger out on others. Although appellant assured his audience he would not harm female

---

[14] Again, appellant, by his seventh issue, separately challenges the trial court's admission of the extraneous-act evidence, but we do not discount it in our sufficiency review. *See supra* note 13.

students, his assurance did not cover male students or Professor Travis.   French "turned to [French's] classmate and was like, well what about us males?"   The State emphasized this point to the jury.   Moreover, the jury had already heard evidence of appellant's letter to Congressman Burgess, which he sent about one week before the classroom comment, in which appellant similarly assured that he would take "great care not to target civilian non-combatant personnel, *specifically women and children* . . . ." (emphasis added).   A rational jury could infer appellant intentionally excluded men from his classroom assurance because he viewed them differently than women.[15]

Alternatively, a rational jury could find appellant threatened, more directly, persons or property in Washington, D.C.   Appellant stated that he was "about to tear Washington, D.C. apart brick-by-brick" using his "specified, specialized military training" because he "cannot get help from [his] government" for his pain.   Appellant then characterized his anger with his AK-47 comment and asked Professor Travis to contact the president or vice president.   Cloutier's takeaway was that appellant was going to ride "in the back of a pickup truck through Washington, D.C. with an AK-47."   Saye also thought appellant directed his threat at the federal government to take down "certain political figures," against whom appellant "needed to vindicate himself in some way."   It is noteworthy that this was about one week after appellant made similar complaints and threats in his letter to Congressman Burgess, which sheds additional light on appellant's words and intent.

---

[15] Defense counsel emphasized that the TWU student body is predominantly female and that appellant's general assurance reflected that rather than isolating male students.   While we consider that a valid point, viewing the evidence in the light most favorable to the prosecution, *see Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012), mandates a different characterization.

Second, we hold a rational jury could have found appellant made the threat with both charged intents. To a certain extent, the analysis of appellant's intent overlaps the analysis of whether he made a threat, and evidence supporting that finding is also relevant in assessing his intent. The evidence supporting either charged intent included appellant's: truculent diction, body language showing anger, and prior bad acts, which shed light on appellant's AK-47 and specialized training references. That appellant looked around the room as he spoke and did not include men in his assurance of no harm supports a finding that appellant intended to place those, or at least some, in the classroom in fear of serious bodily injury. Thus, the evidence was sufficient to convict appellant under section 22.07(a)(5).

On the other hand, appellant's president and vice president references could lead a rational jury to find that appellant intended to influence a branch or agency of the federal government. Appellant said he was about to "tear Washington, D.C. apart brick-by-brick" because he could not get help from the government for his pain. Of course, a demand that his professor contact the federal executive seems irrational, but there is no requirement in the statute that a person making a terroristic threat have reasonable expectations or demands. Thus, viewed in the light most favorable to the prosecution, *see Johnson*, 364 S.W.3d at 293–94; *Brooks*, 323 S.W.3d at 898–99, the evidence was sufficient to convict appellant under section 22.07(a)(6). We overrule appellant's fifth issue.[16]

---

[16] Having found the evidence sufficient to convict appellant under section 22.07(a)(6) with the intent to influence the United States Congress, we need not consider the alternative theory—that he intended to influence the TWUDPS—which is based on the same subsection. *See, e.g., Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007) ("When the trial court's charge authorizes the jury to convict on more than one

### III.  JURY CHARGE ERROR – CAUSE NUMBER 13-12-00454-CR

By his first two issues, appellant argues that, with respect to his conviction pertaining to the TWU incident, the disjunctive submission of two offenses in the jury charge application paragraphs permitted a non-unanimous jury verdict in violation of the Texas and United States Constitutions.[17]  Specifically, appellant contends that the six listed intents in Texas Penal Code section 22.07 constitute six separate and distinct offenses and that the submission of two intents in a single charge application paragraph precluded jury unanimity.  The State insists that the six intents are just different methods of committing one offense, which can be submitted together.  We agree with appellant.

#### A.    Standard of Review

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) (en banc)).  Preservation of charge error does not become an issue until we assess harm.  *Id.* (citing *Middleton*, 125 S.W.3d at 453).

---

theory . . . the verdict of guilt will be upheld if the evidence is sufficient on any of the theories.") (citations omitted).  This is true even considering our jury-charge-error analysis *infra*.  Unlike the issue raised by charging two of the statute's subsections in the disjunctive, *see infra*, both of these theories are based on the same subsection.  Our unit-of-prosecution analysis below does not preclude charging multiple theories of violating a single subjection, *see infra*, and the broad language of this subjection allows alternative theories, each of which constitute a manner of violating the subsection.  *See infra*.

[17] We review appellant's two issues together, as appellant briefed them.  Separately, we note that the United States Supreme Court has ruled the United States Constitution does not require a unanimous jury verdict in state criminal trials.  *See Apodaca v. Oregon*, 406 U.S. 404, 407–14 (1972); *see also Johnson v. Louisiana*, 406 U.S. 356, 359–63 (2000); *Sanchez v. State*, 23 S.W.3d 30, 41 (Tex. Crim. App. 2000) (en banc) (Keller, J., concurring); *Phillips v. State*, 130 S.W.3d 343, 351 n.6 (Tex. App.—Houston [14th Dist.] 2004), *aff'd*, 193 S.W.3d 904 (Tex. Crim. App. 2006).  Appellant, however, quotes more recent language from the Supreme Court that may suggest a softening of that position.  *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3035 n.14 (2010); *see also Blueford v. Arkansas*, 132 S. Ct. 2044, 2051 (2012). Regardless, because appellant neither argued nor cited authority showing that the federal constitution would provide rights or protections beyond those afforded by the state constitution, we address the unanimity issue in the context of Texas law, which is how the court of criminal appeals has approached it. *See Young v. State*, 341 S.W.3d 417, 419 n.2, 421–22 (Tex. Crim. App. 2011).

If we find jury-charge error, we apply one of the two following standards for reviewing harm: "Where there has been a timely objection made at trial, an appellate court will search for only 'some harm.' By contrast, where the error is urged for the first time on appeal, a reviewing court will search for 'egregious harm.'" *Mann v. State*, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998) (en banc) (quoting *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994)).

Statutory construction is a question of law we review de novo. *Harris v. State*, 359 S.W.3d 625, 629 (Tex. Crim. App. 2011); *Ramos v. State*, 303 S.W.3d 302, 306 (Tex. Crim. App. 2009). In construing a statute, we must "seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." *Harris*, 359 S.W.3d at 629 (quoting *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (en banc)). "We look first to the statute's literal text, and 'we read words and phrases in context and construe them according to the rules of grammar and usage.'" *Id.* (quoting *Lopez v. State*, 253 S.W.3d 680, 685 (Tex. Crim. App. 2008)); *Jones v. State*, 323 S.W.3d 885, 888 (Tex. Crim. App. 2010). "We must 'presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible.'" *Harris*, 359 S.W.3d at 629 (quoting *State v. Hardy*, 963 S.W.2d 516, 520 (Tex. Crim. App. 1997) (en banc)). Only if the statutory language is ambiguous or leads to absurd results that the Legislature could not have possibly intended, may we consult extra-textual sources. *Id.*; *Jones*, 323 S.W.3d at 888; *Boykin*, 818 S.W.2d at 785.

In the process, we consider any prior judicial construction of the statute. *Jones*, 323 S.W.3d at 888. A judicial construction of the statute is the law until it is overruled. *Id.* at 888–89. The interests of stare decisis are at their height for judicial constructions of legislative enactments because parties rely on the constructions for guidance in complying with the enactments. *Id.* at 889.

## B. Applicable Law

Under our state constitution, jury unanimity is required in felony cases, and under our state statutes, unanimity is required in all criminal cases. *Young v. State*, 341 S.W.3d 417, 422 (Tex. Crim. App. 2011); *Pizzo v. State*, 235 S.W.3d 711, 714 (Tex. Crim. App. 2007); *see* TEX. CONST. art. V, § 13; TEX. CODE CRIM. PROC. ANN. arts. 37.02–.04 (West, Westlaw through 2013 3d C.S.). "Put simply, the jury must unanimously agree about the occurrence of a single criminal offense, but they need not be unanimous about the specific manner and means of how that offense was committed." *Young*, 341 S.W.3d at 422; *Pizzo*, 235 S.W.3d at 714. "To discern what a jury must be unanimous about, appellate courts examine the statute defining the offense to determine whether the Legislature 'created multiple, separate, offenses, or a single offense' with different methods or means of commission." *Pizzo*, 235 S.W.3d at 714 (quoting *Jefferson v. State*, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006)). In a case like this one, "the proper analysis is to determine whether the Legislature intended for the separate statutory subsections in a single statute to constitute distinct offenses. In other words, we must determine the allowable unit of prosecution" for the offense. *Loving v. State*, 401 S.W.3d 642, 645–46 (Tex. Crim. App. 2013).

20

In assessing the allowable unit of prosecution, we begin by looking to the plain language of the statute and any case law interpreting it. *Id.* at 646. "Absent an express statement defining the allowable unit of prosecution, the gravamen of an offense best describes the allowable unit of prosecution." *Id.* at 647; *see Harris*, 359 S.W.3d at 630; *Jones*, 323 S.W.3d 889; *Pizzo*, 235 S.W.3d at 714; *Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008). To clarify some of the difficulty surrounding unanimity issues, the court of criminal appeals has identified three offense gravamina: (1) "result of conduct" offenses, which focus on the product of certain conduct; (2) "nature of conduct" offenses, which proscribe certain acts or conduct, "regardless of any result that might occur;" and (3) "circumstances of conduct" offenses, which focus on surrounding circumstances to criminalize otherwise innocent behavior. *Loving*, 401 S.W.3d at 647; *Young*, 341 S.W.3d at 423; *McQueen v. State*, 781 S.W.2d 600, 603 (Tex. Crim. App. 1989) (en banc); *see also* Tex. Penal Code Ann. § 6.03.

> In "result of conduct" offenses, the jury must be unanimous about the specific result required by the statute. With "nature of conduct" crimes, the jury must be unanimous about the specific criminal act, and with "circumstances surrounding the conduct" offenses, unanimity is required about the existence of the particular circumstances that makes the otherwise innocent act criminal.

*Young*, 341 S.W.3d at 424.

> If the focus of the offense is the result—that is, the offense is a "result of conduct" crime—then different types of results are considered to be separate offenses, but different types of conduct are not. On the other hand, if the focus of the offense is the conduct—that is, the offense is a "nature of conduct" crime—then different types of conduct are considered to be separate offenses.

*Huffman*, 267 S.W.3d at 907.

The court of criminal appeals has identified various tools that may help determine a statute's gravamen, such as grammar, including focus on verb forms, identification of what offense element completes the offense, and consideration of whether each statutory provision concerns a different type of harm.   *See Loving*, 401 S.W.3d at 647; *Harris*, 359 S.W.3d at 630; *Jones*, 323 S.W.3d at 890–92.   The Legislature's assignment of different punishment ranges to different statute subsections can also indicate the subsections are separate offenses rather than manners of committing a single offense.   *See Jones*, 323 S.W.3d at 890; *Dolkart v. State*, 197 S.W.3d 887, 893 (Tex. App.—Dallas 2006, pet. ref'd). But, the court of criminal appeals has cautioned against placing undue weight on a statute's punishment provisions, especially when "more weighty factors are available for consideration."   *See Jones*, 323 S.W.3d at 890.

The terroristic threat statute reads:

(a) A person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to:

(1) cause a reaction of any type to his threat by an official or volunteer agency organized to deal with emergencies;

(2) place any person in fear of imminent serious bodily injury;

(3) prevent or interrupt the occupation or use of a building, room, place of assembly, place to which the public has access, place of employment or occupation, aircraft, automobile, or other form of conveyance, or other public place;

(4) cause impairment or interruption of public communications, public transportation, public water, gas, or power supply or other public service;

(5) place the public or a substantial group of the public in fear of serious bodily injury; or

22

(6) influence the conduct or activities of a branch or agency of the federal government, the state, or a political subdivision of the state.

TEX. PENAL CODE ANN. § 22.07(a). An offense under subsection (a)(1) is a class B misdemeanor. *Id.* § 22.07(b). A violation of subsection (a)(2) is also a class B misdemeanor, but it is a class A misdemeanor if committed against a family or household member or a public servant. *Id.* § 22.07(c). An offense under subsection (a)(3) is a class A misdemeanor, but it is a state jail felony if the actor causes a pecuniary loss of $1,500 or more. *Id.* § 22.07(d). A violation of subsections (a)(4) through (a)(6) is a third degree felony. *Id.* § 22.07(e).

## C. Discussion

In essence, our task is to determine whether the six intents illustrate *how* a terroristic threat may be committed or, instead, independently establish *what* constitutes the offense. *See Pizzo*, 235 S.W.3d at 722. The Texas Court of Criminal Appeals has explained, "It should be realized that it is the desired reaction of the listener, irregardless [sic] of whether or not the threat is real, that constitutes the offense." *Jarrell*, 537 S.W.2d at 257 (quoting BRANCH'S ANNOTATED PENAL CODE § 22.07 (3d ed. 1973)). In context, the court of criminal appeals was addressing the defendant's evidentiary argument that his inability to execute a threat undermined his conviction. *See id.* The clarification nevertheless emphasized that the statute's gravamen is the intended effect of a threat, not the threat itself. *See id.* In other words, the gravamen of the statute, as implicated by the statute's name, is terrorizing by threat; a threat, without a terroristic intent, is not a *terroristic* threat. *See* TEX. PENAL CODE ANN. § 22.07(a); *Jarrell*, 537 S.W.2d at 257.[18]

---

[18] The State recognizes this, admitting in its brief that "the gravamen of the offense is the intent

The element that completes the offense, *see Loving*, 401 S.W.3d at 647; *Harris*, 359 S.W.3d at 630; *Jones*, 323 S.W.3d at 890, is the actor's intent to cause a particular reaction by threatening. *See Dues*, 634 S.W.2d at 306; *Phillips*, 401 S.W.3d at 292; *In re A.C.*, 48 S.W.3d at 904.

The statute proscribes six separate terroristic objectives. *See* TEX. PENAL CODE ANN. § 22.07(a)*.* Beginning with the first enumerated intent and progressing through the list, the severity or audience associated with each terroristic aim increases correspondingly. *See id.* Not coincidentally, so does the punishment. *See id.* § 22.07(b)–(e).[19] The disparity in correlative punishment ranges shows the Legislature is not merely outlining different manners of committing the same offense. *See Jones*, 323 S.W.3d at 890;[20] *Dolkart*, 197 S.W.3d at 893. The Legislature views and treats some terroristic objectives more seriously than others, *see* TEX. PENAL CODE ANN. § 22.07(b)–(e), which shows the Legislature intended each subsection to be a separate, punishable offense. *See Loving*, 401 S.W.3d at 647; *Haight v. State*, 137 S.W.3d 48, 50–51 (Tex.

---

itself . . . ."

[19] It is noteworthy that the jury charge also charged appellant with an offense under section 22.07(a)(3)—the prevention or interruption of the occupation or use of a public building—as a lesser-included offense. An offense under subsection (a)(3) is a class A misdemeanor. *See* TEX. PENAL CODE ANN. § 22.07(d) (West, Westlaw through 2013 3d C.S.).

[20] The *Jones* Court's caution against relying too heavily on a statute's punishment provisions addressed a different issue than the practical concerns posed by this statute. *See Jones v. State*, 323 S.W.3d 885, 890 (Tex. Crim. App. 2010). The *Jones* Court was explaining that the Legislature's subsequent addition of punishment ranges to a statute did not change the Court's prior assessment of the statute's gravamen. *See id.* The added punishment provisions to that statute, which outlawed making a false statement to obtain property or credit, categorized offense degrees by threshold pecuniary amounts of property or credit sought by the actor. *See id.*; *see also* TEX. PENAL CODE ANN. § 32.32 (West, Westlaw through 2013 3d C.S.). Unlike the statute in this case, the ranges outlined in section 32.32 dictated the offense degree without regard to which subsection of the statute the actor violated; the ranges applied equally to all subsections. Here, on the other hand, a case's applicable offense range wholly depends on which specific subsection of section 22.07 a person violates. *See* TEX. PENAL CODE ANN. § 22.07(b)–(e) (West, Westlaw through 2013 3d C.S.).

Crim. App. 2004). The statute's focus on separately-punishable intents rather than circumstances or results shows the offense is conduct-oriented; "[I]f the focus of the offense is on the conduct . . . the offense is a 'nature of conduct' crime . . . ." *Huffman*, 267 S.W.3d at 907. For conduct-oriented offenses, the jury must be unanimous about the specific criminal act. *See Young*, 341 S.W.3d at 424.

Of more practical concern, because the six intents have different punishment ranges, a general guilty verdict gives a trial court no direction on which punishment range applies in a case. For example, if a defendant is charged under sections 22.07(a)(2) (intending to place a person in fear of imminent serious bodily injury) and 22.07(a)(5) (intending to place a group of the public in fear of serious bodily injury), and a jury returns one guilty verdict, the trial court is unable to determine whether the jury unanimously found the defendant committed a class B misdemeanor, a third-degree felony, or neither. *See* TEX. PENAL CODE ANN. § 22.07(a)(2), (5), (c), (e). We cannot presume the Legislature intended to undermine jury unanimity, confuse trial courts, or thwart the prosecution of terroristic threats rather than effect such prosecution. *See* TEX. GOV'T CODE ANN. § 311.021(1)–(4) (West, Westlaw through 2013 3d C.S.). We conclude the trial court erred in submitting two offenses under one verdict form.

### D.     Harm

Appellant did not object to the jury charge at trial. Therefore, because the error is being urged for the first time on appeal, we review the record for egregious harm. *Mann*, 964 S.W.2d at 641. Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory.

*Allen v. State*, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008) (citing *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007); *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2007)). The error must have been so harmful as to effectively deny the accused a fair and impartial trial. *See Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008).

In determining whether appellant was deprived of a fair and impartial trial, we review "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011) (quoting *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc)). We will examine "any . . . part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *Id.* at 490 (quoting *Almanza,* 686 S.W.2d at 174).

### 1. Jury Charge

Looking first to the jury charge, it outlined the terroristic threat elements under Texas Penal Code section 22.07(a)(5) and (a)(6) together in one paragraph. The four application paragraphs preceding the single verdict form allowed the jury to convict appellant of one offense if it found beyond a reasonable doubt he violated 22.07(a)(5) or (a)(6). This type of "mix and match" verdict deprives a defendant of the right to a unanimous jury verdict. *See Ngo*, 175 S.W.3d at 750–52. Rather, the law requires that "each and every juror agree[] that the defendant committed the same, single, specific criminal act." *Id.* at 745; *see Stuhler*, 218 S.W.3d at 719; *Francis v. State*, 36 S.W.3d

26

121, 125 (Tex. Crim. App. 2000) (en banc) ("An unanimous jury verdict ensures that the jury agrees on the factual elements underlying an offense—it is more than mere agreement on a violation of a statute.").

The State argues the charge nevertheless "clearly spelled out the general unanimity requirement." We disagree. As in *Ngo*, "the word 'unanimously' appeared only in the 'boilerplate' section of the jury charge dealing with selection of a jury foreman[.]" *Ngo*, 175 S.W.3d at 744–45. The paragraph read in full:

> After you retire to your jury room you should select one of your members as your Presiding Juror. It is the Presiding Juror's duty to preside at your deliberations, vote with you, and when you have unanimously agreed upon a verdict, to certify to your verdict by using the appropriate form, and signing the same as Presiding Juror.

This paragraph is almost identical to the one the *Ngo* Court held inadequate to correct the unanimity issue in that case. As in that case, "the jury could well have believed that they need only be unanimous about their 'verdict' of guilty or not guilty of the general offense . . . ." *Id*. at 745. This factor weighs in favor of finding egregious harm. *See id*. at 752.

### 2. Evidence and Argument of Counsel

A rational juror could have found appellant made threats involving violence with the intent to place persons in the classroom in fear of serious bodily injury. The same juror could have found the evidence insufficient to convict appellant of intending to influence the United States Congress. Defense counsel argued that the evidence was insufficient to convict appellant on either ground, and the juror could have found the

27

argument compelling as it related to the charge that appellant intended to influence the United States Congress.

Unconstrained by a review that views the evidence in the light most favorable to the prosecution, we recognize that the juror would be reasonable in construing appellant's president and vice president references to be references to those positions at the university rather than the federal government; it is arguably more likely that appellant wanted Professor Travis to contact the university administration rather than the federal government. The same juror would also be reasonable in finding that the classroom context of the statements, while supporting a finding that appellant threatened the classroom audience, made it unlikely appellant was attempting to influence the United States Congress. The juror could construe appellant's invective against the federal government as an explanation for his anger rather than his intended target. Regarding the TWUDPS, the juror could have concluded there was no evidence appellant intended to influence the campus police or even anticipated its involvement. The testimony of other witnesses shows they were surprised appellant's comments prompted the campus police's response.

A different rational juror on the same jury could have found that appellant's threat was made with the intent to influence the United States Congress. This juror could have agreed with defense counsel that the evidence did not support an intent to place the public in fear of serious bodily injury. Again being unconstrained by the sufficiency review, we hold this juror could have found appellant's assurance that he would not "hurt any of the girls at this college" to undermine a finding that appellant threatened or intended to scare

28

his audience; after hearing evidence that the TWU student body was predominantly female, this juror would be reasonable in interpreting the assurance as a general one rather than as a subtle threat to men. This juror could conclude appellant's diction reflected a threat and intent directed at the federal government and expressly away from the classroom and campus public.

Under this jury charge, these two jurors could convict appellant for the same offense. The charge enabled the State to overcome the potential evidentiary challenges by not requiring the jurors to agree on which direction the evidence pointed. These two factors weigh in favor of finding egregious harm. *See Ngo*, 175 S.W.3d at 752 (holding harm was egregious because the State lumped three offenses under the same charge and, "given the state of the evidence, we . . . cannot determine that the jury was, in fact, unanimous in finding appellant guilty of one specific . . . offense.").

### 3.    Other Relevant Information

In its closing argument, the State highlighted the jury charge's allowance for non-unanimous finding:

> In the TWU incident we list out four different ways that Christopher Gillette committed a terroristic threat on March the 1st of 2011. And in between each of those paragraphs in the jury charge, there's the word "or."

> And so there doesn't have to be jury unanimity, meaning that all 12 of you do not have to agree on one of each of these four different ways. Theoretically three of you could agree it was committed in one of the paragraphs and then three on each of the next three paragraphs.

Thus, the State heightened the potential for a non-unanimous verdict. *See Mathonican v. State*, 194 S.W.3d 59, 66 (Tex. App.—Texarkana 2006, no pet.) (holding that a prosecutor's emphasis of a jury-charge allowance for a non-unanimous verdict

29

contributed to the harm, which the appellate court found egregious). This factor weighs in favor of finding egregious harm. *See id.*; see also *Ngo*, 175 S.W.3d at 752 (finding egregious harm because prosecutor and trial court made misleading statements about unanimity during jury voir dire).

### 4. Summary

After reviewing the relevant factors, we conclude that the submission of the two offenses for a single verdict actually and egregiously harmed appellant, denying him the valuable right to a unanimous verdict. *See Taylor*, 332 S.W.3d at 490; *Allen*, 253 S.W.3d at 264. We sustain appellant's first and second issues. Having concluded that a terroristic threat is a conduct-oriented offense, we overrule appellant's third and fourth issues, which appellant argues in the alternative should we have considered the offense to be result-oriented rather than conduct-oriented.

## IV. EXTRANEOUS-ACT EVIDENCE

By his seventh and eighth issues, appellant contends the trial court erred by admitting evidence of extraneous acts in violation of Texas Rules of Evidence 403 and 404(b). The evidence appellant references is the aggressive email he sent to his friend and the evidence of the confrontation he had with a professor at another university. Because appellant's trial strategy was to deny an intent to threaten, the trial court overruled his rule 403 and 404(b) objections and allowed evidence of both acts as proof of motive, intent, preparation, plan, or absence of mistake or accident. Before admitting testimony regarding the acts, however, the trial court instructed the jury to not consider

30

the testimony except to prove motive, intent, preparation, plan, or absence of mistake or accident.   The trial court included the same instruction in the jury charges.

Given that we sustained appellant's first two issues and are remanding appellate cause number 13-12-00454-CR because of jury-charge error, we need not assess the relevance or impact the extraneous-act evidence had on that verdict.   *See* Tᴇx. R. Aᴘᴘ. P. 47.1.   We evaluate appellant's seventh and eighth issues only as they relate to appellant's conviction resulting from his letter to United States Congressman Michael Burgess, and we evaluate the two issues together.

## A.   Standard of Review

We review a trial court's decision to admit evidence under rules 403 and 404(b) for an abuse of discretion.   *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "As long as the trial court's ruling is within the zone of reasonable disagreement, there is no abuse of discretion, and the trial court's ruling will be upheld."   *Id.* at 343–44.

> A trial court's ruling is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.

*Id.* at 344.   If the trial court's ruling is correct under any applicable theory of law, it will not be disturbed.   *Id.*

## B.   Discussion

### 1.     Rule 404(b)

Rule 404(b) of the Texas Rules of Evidence states that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action

31

in conformity therewith. TEX. R. CIV. EVID 404(b). The rule, however, does allow such evidence to be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

The trial court stated that it was allowing this evidence as proof of motive, intent, preparation, plan, or absence of mistake or accident, and it instructed the jury to not consider the testimony except to prove motive, intent, preparation, plan, or absence of mistake or accident; and included the same instruction in the jury charge. Appellant contends the two extraneous acts were inadmissible under rule 404(b) but fails to provide any argument, discussion, or legal authority to support his rule 404(b) issue on appeal. Appellant's "Application of Facts and Law" sections only discuss rule 403. As such, appellant has not properly briefed this issue. TEX. R. APP. P. 38.1.

Notwithstanding, we disagree that the two extraneous acts were inadmissible under rule 404(b). Evidence of appellant's prior threats undermined his defensive theory that he was momentarily carried away but not intending to threaten anyone. The fact that appellant previously used similar threatening language that caused fear and reproach shows that appellant was aware of the impact from using this type of language. That he again resorted to it supports a finding that he intended to cause the natural response such alarming invective predictably evokes, indicating an absence of mistake and accident. *See* TEX. R. EVID. 404(b) (providing extraneous-act evidence may be used to prove intent and the absence of mistake or accident).

## 2. Rule 403

Rule 403 of the Texas Rules of Evidence states that evidence, although relevant,

may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403. In reviewing rule 403 objections, we consider the following factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *Montgomery v. State*, 810 S.W.2d 372, 389–90 (Tex. Crim. App. 1990) (en banc). In evaluating the need for the evidence, we must consider: (1) whether the proponent has other available evidence to establish the fact of consequence that the evidence is relevant to show; (2) the strength of the other evidence; and (3) whether the fact of consequence is related to an issue that is in dispute. *Erazo*, 144 S.W.3d at 495–96; *Montgomery*, 810 S.W.2d at 390. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Montgomery*, 810 S.W.3d at 389. "It is only when there exists a clear disparity between the degree of prejudice of the offered evidence and its probative value that Rule 403 bars its admission." *Young v. State*, 283 S.W.3d 854, 877 (Tex. Crim. App. 2009).

Turning to appellant's rule 403 challenge, as reflected in the previous section, we consider the evidence highly probative of intent. *See Erazo*, 144 S.W.3d at 489 (identifying probative value as first factor of rule 403 review); *Montgomery*, 810 S.W.2d at 389–90 (same). We appreciate the potential impact this particular evidence could

have had on the jury. "All testimony and physical evidence are likely [to] be prejudicial to one party or the other." *Davis*, 329 S.W.3d at 806. Given the nature of this evidence, especially appellant's colorful email to his friend, the potential for impact cannot be minimized, and the State took significant time developing the evidence by presenting witnesses and exhibits. *See Erazo*, 144 S.W.3d at 489 (holding the potential to impress the jury and the time needed to develop evidence are two necessary factors of a rule 403 analysis); *Montgomery*, 810 S.W.2d at 390 (same).

On the other hand, the State needed this evidence to establish intent. *See Erazo*, 144 S.W.3d at 489 (last factor is proponent's need for evidence); *Montgomery*, 810 S.W.2d at 390 (same). There was no other evidence, except the letter to Congressman Burgess, that shed light on appellant's mental state, and appellant's intent to threaten, which the defense denied, was the primary issue of dispute. *See Erazo*, 144 S.W.3d at 495–96 (discussing three factors for evaluating the need for the evidence); *Montgomery*, 810 S.W.3d at 390 (same). On balance, we conclude the State's need for the extraneous-act evidence was high and hold that the probative value of the evidence was not substantially outweighed by its prejudicial effect. *See* TEX. R. EVID. 403; *Young*, (only clear disparity between prejudice and probative value warrants exclusion under rule 403).

Moreover, the trial court instructed the jury to consider the extraneous-act evidence only as it related to appellant's motive, intent, preparation, plan, or absence of mistake or accident, and we presume, without evidence to the contrary, that the jury followed the trial court's instructions. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (citations omitted); *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005) (citations

34

omitted). We conclude the trial court's ruling fell within the zone of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 343. We overrule appellant's seventh and eighth issues.

## V. CONCLUSION

We affirm the trial court's judgment in appellate cause number 13-12-00455-CR. We reverse the trial court's judgment in appellate cause number 13-12-00454-CR and remand it for a new trial.

GREGORY T. PERKES
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
26th day of August, 2014.